May it please the Court, Don Lanson of Manfreda Levine on behalf of Appellant Harding & Leggett. The main thrust of my argument today can be summed up in one word, and that's accountability. Accountability is a big topic today with the concept of it's too big to fail finally being recognized as a problem. In this situation, the plan board was accountable to my client to fairly interpret the terms of the plan and applicable statutes so as to come up with a withdrawal liability that was fair and reasonable under the circumstances. Ultimately, they failed to comply with that obligation in every possible way you can think of that I'll go through and what's been through in our briefs. And ultimately, every single variable that could have gone my client's way didn't. From every calculation that could have been made. But isn't the problem is, I mean, that's certainly your position, but the district court held a lengthy evidentiary hearing, considered all of these arguments that you made, and made factual findings that we can't overcome, I mean, we can't overturn unless they're clearly erroneous. And no matter what the merits of your client's arguments are, the district court is the primary vehicle for deciding what the facts are. Your Honor, the district court judge is a very learned, well-respected judge, and obviously went through the evidence very, you know, detailed. The problem, though, in looking at the final decision, I believe that the trial court was motivated not by the evidence so much as the impact. And in fact, if you look at the decision, one of the comments that the trial court made was specifically identifying this public policy concept that was most important to the trial judge. And that being that the potential impact on other employers of withdrawing and what that would mean. Now, if this was a multi-employer plan, there's actually a statute that says that you can take disincentivizing other employers from withdrawing as a factor. We have a multiple employer plan. There isn't such a requirement. There's no public policy concept in the plan or in the statutes that would apply to this plan. So as much as I can appreciate that the trial judge wanted to incorporate that, the actual evidence doesn't demonstrate that that factor can be used as a determination on the withdrawal liability. So I think, unfortunately, the trial judge looked at all this and said, we have a lot of issues here, but I would rather look and maintain the deference, again, under the it's too big to fail mentality and maintain that process for the benefit of the plan board. Wasn't the ultimate question before the district court judge was whether the plan's determination was an abuse of discretion? Correct. And it's two layers of abuse of discretion, and I understand that. So why was there an abuse of discretion here? In looking at what the plan board did, there's three basic areas of problems. First, they didn't get the information to my client in a timely fashion in terms of what the liabilities and assets were and whether the plan was sufficient. In fact, it took until four months before trial for us to finally get all of the information as to where the number came from. In fact, my client, who has been around for 80 years, is 1% of the unfunded liability, paid $800,000 in the dark not knowing what the number was in a good faith attempt to try to satisfy their obligation and waited a year, a year and a half, to finally get all of the backup documentation as to where this number came from and ultimately demonstrates that a lot of the way it was determined was wrong. And that comes to the second problem, is that there's a certification by the actuary and the plan sponsor to say that the information is accurate and complete. We detailed the missing participants that weren't located. The obituary sections in newspapers were looked at and Alexa search was done. That was the extent of it. Whereas now, they have actually hired an outside company to do this investigation, which is what they should have done from the beginning. Second of all, they're paying, and one of the most egregious things, 217 deferred vested beneficiaries are still being paid even though they are dead because it was assumed that their spouses were still living when ultimately a lot of them aren't. So all of these assumptions that go into it, I appreciate that this is an actuarial assumption process to a large degree. But if you're going to do a hypothetical termination, you have to go through the steps to actually investigate where these people are. You can't find out if somebody's dead unless you actually look, unless you actually take that affirmative step. One of the aspects of acting reasonably by somebody like the plan board seems to me is whether they treat people equally. I mean, there's no evidence that your client was treated differently than other withdrawing participants. Well, there weren't that many other withdrawing employers. Employers. So it's hard to have a frame of reference to say how they were treating those equally because it wasn't a big enough pool of people and employers to really look at. But along that same line, I think there was different treatment, especially on the interest rate. And this is, I think, the most egregious part of the process. They applied the PPGC 3.8% interest rate, saying that's just the standard market rate, when in fact it's supposed to be an average rate. In fact, ultimately, the best rate you can get in what was presented at trial was 6.1%, or at least the 5.5%, which was the corporate bond rate. And again, the most telling, they used 7.5% in 2005 as the interest rate they were using for their investments. And yet we're charging half of that for purposes of my client's withdrawal liability. It makes absolutely no sense. There should be some kind of requirement they at least use the same interest rate they're using for their governmental purposes for purposes of determining the withdrawal liability. What would be the requirement? Where would that requirement come from? A presumption to the extent that. Statutorily based? Plan based? It's not. Here's the problem. Multiple employer plans. Right. There's not a whole lot that covers it. And especially on a hypothetical termination. So the question is abuse of discretion. And what was the ultimate concern of the plan? And what was the whole purpose of it? And again, you're raising what I think absolutely the trial judge said too. Isn't the ultimate victim here going to be the rest of the beneficiaries because your client gets out for a cheaper amount than they're supposed to pay? I understand that. But if the number is right, if the mathematical calculation is done accurately, there shouldn't be any victims at the end of the day. We're not looking at this way. By that same token, my client shouldn't have to pay a withdrawal penalty just because they want to get out of a plan that's being mismanaged or for whatever reason. Why do you say it's a penalty? Because by them paying an excess amount. Say if they applied 7.5 or 6, whatever percentage rate, the withdrawal liability would have been less than the $800,000 they actually paid. I thought there was testimony at trial by the experts. I forget which side. Probably the plan side. But in the end, it looked whether you had applied, you know, the dispute was over a distress or under the statute it was a distress and standard. But in the end here, I thought it was pretty much didn't wash down. It pretty much was fairly similar according to the experts. The argument is it doesn't matter if it's a standard or distress termination. You get to the same point because you're applying an interest rate. So it doesn't matter how you go. I would say, no, that's not true. If you're being taken, if you're in bankruptcy, the interest rate you're going to get through PPGC or through whatever is going to be a lot lower than you're going to get if you're terminating a plan, a Sunkist plan, for 37 or 25 employers. You're going to get a much higher interest rate. So I would say, no, that's not correct. You may, you know, in terms of how the method of termination is done, fine. But in terms of the ultimate impact, no, it's a much different process. And, in fact, one of the arguments we had is they must be considered. And if it's a standard or distress termination,   And if it's a standard or distress termination, it's not going to be a higher interest rate. This is a common argument. It's a common argument. But it is. What did the experts testify at trial? Our experts testified that 6.1 would have been the appropriate rate. What did the experts for the Sunkist test? They indicated that the PPGC rate is considered an average market rate of what was applicable. But keep in mind, I apply And was that for the district court to sort of assess which one was, you know, taking all the evidence into account? Yes, but again Why are his findings clearly erroneous? Because at the end of the day, I don't think the court actually gave a final ruling or a final decision at that point and instead looked at the bigger issue of what you just pointed out, which is stuck in your mind, is All right, all of that aside It's not stuck in my mind. I mean, I'm just asking what the bottom line is here because that's ultimately what was at stake. I mean, that's what the plan board was concerned about. Correct. In that situation, then, again, by that virtue, then there's no decision of the plan board that could be evaluated. These decisions are not considered Well, let me just answer for example. So you start off by talking about how there were some of the assumptions were with respect to the number of people who had died and their spouses were still receiving benefits, but maybe not, in fact. And you complained about the way in which they attempted to investigate. So did you put any evidence in about what is standard practice? Yes, the expert How this goes about and what they did here was below standard? Yes, the expert testified as to what the procedure should have been. They should have hired an outside company to actually go through, get death certificates, and go through that process. And was there any evidence that And what was it, LexisNexis was not an appropriate source? Correct. Yes, that's what the expert testified, that ultimately using that and obituaries from a newspaper in and of itself is not a sufficient way to satisfy the statute's requirement for investigating for a termination. Again, we're dealing with a hypothetical termination, so it's tough. But you have to go through the steps anyway. I mean, my wife always says, keep buying me birthday presents even though I take them back. You still have to keep buying them. That's my obligation to her. Here, they have an obligation to go through the steps. So, and again, at the end of the day, by virtue of the misparticipants and including also the incorporation of a job elimination benefit that didn't exist anymore under terms of that plan. All of the things that But the district court made a specific finding that it was just inadvertently left out of one of the plans and then they later put it in the plan and somebody's actually getting the benefit. Again, that's a public policy argument that doesn't comply with the terms of the plan and the statutes. That's a determination of, you know what, I'm going to look the other way for the, again, it's too big to fail. I don't want to end up creating problems because Well, no, it was a clerical error that it was left out. I mean, that was the finding. That's not a policy ground. What I'm saying is at the end of the day, my client's the one that has to be penalized by virtue of that clerical error. Anyway, I'll reserve the rest of my time. All right. Good morning, Your Honors. Larry Walraven on behalf of the Plaintiff and Appalee, the Planned Board of the Son's History Retirement Plan. May it please the Court. The real issue that the defendant has here is a plan design issue. And the plan expressly provides that if an employer withdraws, we do a plan termination calculation. We had a trial on this. We had three actuaries testify. The plan's actuaries said we use the PBGC rates because the PBGC itself says these rates, when taken together, approximate the terminal annuity insurance market, which is what the exercise is intended to do. The Court listened to those actuaries, tested them, even asked them questions, and made specific findings of fact. In fact, the district court, after reviewing all the evidence, hearing the actuaries, made a specific finding of fact as to the amount of the unfunded liabilities. Those findings of fact can't be overturned unless they're clearly erroneous. And as the Ninth Circuit cases have noted, that the findings of fact in this circumstance are subject to the clearly erroneous standard, and credibility calls, which the Court expressly made in this case,  the Court listened to the three actuaries. The Court listened to the plan administrators who testified, the activities that they go through with respect to how they find participants, make adjustments for participants that are dead, and made express findings of fact and credibility determinations. With respect to the LexisNexis issue, this particularly is an area in which the Court made a credibility finding. The Court expressly says, I find the defendant's expert, who was their only witness at trial, not credible. And he didn't testify that LexisNexis didn't qualify as an appropriate search vehicle. He testified he didn't know what LexisNexis was. And the Court made an express credibility finding on that. I will address, again, Your Honors, the issue of using one interest rate for ongoing plan funding versus the terminal annuity issue. In the ongoing analysis and in the multi-context under MEPA, the interest rate used or the combination of interest rate and mortality are designed to best estimate what the plan will experience over time. That's what an ongoing funding analysis is, which means it has to take into consideration the investment mix of the assets of the plan. MEPA does exactly the same thing in the multi-context for the joint and trustee plans. They're not doing a plan termination calculation. This plan expressly provides, if an employer withdraws, a plan termination calculation is done. And that means you have to estimate what it's going to take to purchase terminal annuities for everyone. And that's the point of the PBGC regulations, that these interest and mortality combinations replicate the insurance market. And we put on an expert who spent 30 years in the insurance market and said that's correct because the PBGC surveys insurance companies as to pricing of terminal annuities. Finally, with respect to one last issue with respect to credibility, the expert and the only witness that the defendant put on at trial testified that, in his opinion, you should use the 5.57 interest rate with the 1983 mortality table. In fact, he based that on, and in the employer's supplemental excerpts of record, he based that on an email that he received from a MetLife representative. And in that very email, the MetLife representative said, if we were going to price this, we would match duration LIBOR with the 1994 mortality table. The evidence that he used to assert his opinion was defied by evidence in the record. The quotation he received was a different mortality table with a higher interest rate. Our expert addressed that. He's the only one that did address that in the record. And he said, if you take the higher interest rate with the 1994 GAR and you compare it to the lower interest rate of the PBGC assumption with the 1983 GAM, those are going to come out roughly similar. And that's exactly what the PBGC says in its regs when it moved to the 94 GAR in 2006, unless there are further questions. Just so I can understand this whole system, I was just curious, was there another method that the plan could have used that would have been less costly for the employer? Well, you have to do it. And it would achieve the same objectives? No, because you have to do a plan termination calculation, which is if we're going to assess liability, which means we have to assume we're going to terminate this plan, which means we can't ever go back and get more contributions, which is another distinction from ongoing funding. And in that circumstance, what you settle it up with a terminal annuity or you pay the PBGC, but the PBGC has said we've set these rates to match the insurance market. Okay. I see.  Thank you. Thank you, Your Honor. For purposes of this process, a hypothetical termination is difficult to put your hands around. The comment you just made actually made me think of the cases we cited from the Sixth and Tenth Circuits in a bankruptcy context, but they deal with the fact that those courts there found that the PBGC rate was not appropriate and in fact ultimately used a bankruptcy term, which is the prudent investor rate, for finding what the appropriate interest rate was supposed to be, because ultimately those courts found the PBGC rate did not accurately reflect what market conditions were because it's an average. It's not the highest that you would get if you were going out and trying to, you know, get a commitment from an insurance company with regard to that plan. And that's the problem we have here, is they didn't do it. They didn't even try to get a non-binding quote. They didn't call GEICO or anybody else to sit there and see what possible rate would have existed had they even tried. And the reason is because they didn't want to. They didn't want to make this number any higher. And I think, unfortunately, the trial court understood that. You mean the discount rate? Huh? You mean the discount rate? Correct. I think the trial court understood that and perceived that, but it unfortunately looked the other way, trying to make sure that at the end of the day, the deference was given so as to not make sure that other beneficiaries were burdened. There is nothing in this plan that allows that factor to be considered. That's where I think the abuse of discretion came in. Thank you. Okay. Thank you very much, counsel. We appreciate your arguments this morning. And plan board of Sunkist Retirement versus Harding and Leggett is submitted at this time. And that ends our session for the day and for the week. Thank you all very much. All rise.
judges: Jones, Pregerson, Paez